UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE DAVID L. VALDIVIA,

        Debtor.
_____/

DAVID L. VALDIVIA,

        Appellant,                        Case Number 20-12076
v.                                                       Honorable David M. Lawson

MARY A. HAUK,

        Appellee.
_____/

## **OPINION**

David L. Valdivia filed a Chapter 13 bankruptcy petition seeking to discharge a $300,000 debt to his ex-wife that arose from a divorce case. In an adversary proceeding brought by Valdivia's ex-wife, Mary Hauk, the bankruptcy court determined on summary judgment that the debt was a nondischargeable spousal support obligation under 11 U.S.C. § 523(a)(5), and at trial that the amount reasonably may be regarded as being within Valdivia's present and future capacity to repay. Valdivia appeals both rulings. This Court affirms.

I.

Debtor David L. Valdivia divorced Mary Hauk in 2010. The divorce judgment obligated Valdivia to pay Hauk for certain property he converted and for support. The dissolution of that marriage and the judgment that was entered sparked nearly a decade of bitter litigation, which culminated with the parties' entry into a consent judgment in 2019 requiring Valdivia to pay Hauk $300,000. That sum "was labeled as support," and, as stated in the consent judgment, "was 'intended by the parties and determined by the Court not to be discharged in bankruptcy'; and that

'any debt or debt obligation incurred by' [Valdivia] 'as a consequence of this Judgment . . . will not be discharged in bankruptcy.'" *In re Valdivia*, 615 B.R. 231, 237 (Bankr. E.D. Mich. 2020) (quoting Judgment of Divorce).

Despite that clear language, almost immediately upon concluding that "resolution" of the marital dispute, Valdivia made a beeline for the bankruptcy court and filed a Chapter 13 petition, seeking to avoid his only significant debt, which was the obligation that he assumed under the consent judgment to pay approximately $300,000 to his ex-wife. *Id.* at 235. Hauk promptly filed an adversary proceeding in the bankruptcy court seeking a ruling that the $300,000 judgment debt was nondischargeable under several theories, including that the debt was for a domestic support obligation. *See* 11 U.S.C. § 523(a)(5).

The parties filed cross-motions for summary judgment. The bankruptcy court ruled that the debt did not arise from "any fraud, conversion, breach of fiduciary duty, bad faith, intentional harm, or other misconduct by" Valdivia, since the state court had determined that he repaid funds he converted or misappropriated back in 2012. *In re Valdivia*, 615 B.R. at 236. However, the court held as a matter of law that the debt qualified as a support obligation under section 523(a)(5). *Ibid.* The parties then proceeded to trial on the remaining unresolved factual question of whether "'although the obligation is of the type that may not be discharged in bankruptcy, its amount is unreasonable in light of the debtor spouse's financial circumstances.'" *In re Valdivia*, 617 B.R. 278, 281 (Bankr. E.D. Mich. 2020) (quoting *In re Schubiner*, 590 B.R. 362, 394-95 (Bankr. E.D. Mich. 2018)).

The bankruptcy court held that the $300,000 debt was not unreasonable in light of Valdivia's financial circumstances and did not exceed what he could reasonably be expected to pay. The trial opinion included a comprehensive recitation of the evidence taken, and the court

summarized its factual findings on the debtor-appellant's ability to repay the spousal support debt as follows:

> Given the Defendant's burden of proof, and the evidence presented, the Court must assume that Defendant has the ability to pay his Debt to Plaintiff, from the following resources:
>
> » Defendant's $451.68 per month in disposable income disclosed by his Schedule I and J (= $5,420.16 per year = $54,201.60 over ten years = $81,302.24 over fifteen years);
>
> » Defendant's ability to earn additional income, in an unknown amount, now and in the future, by obtaining additional employment, in addition to his current part-time job working for his father, including possible cement construction jobs;
>
> » Defendant's proceeds from a sale of Defendant's Deering property (unknown amount, but under Plaintiff's valuation this could yield up to $80,000.00, less sale costs, for Defendant's one-half share);
>
> » Defendant's proceeds from a sale of the 2008 Ford Taurus ($2,000.00);
>
> » Defendant's future realization of the value of the Rental Acosta business, in an unknown amount, from either (1) realizing the profit (unknown amount) from operating the business for an unknown number of years; (2) selling the business on a going-concern basis (value unknown); or (3) liquidating the 8-9 pieces of real property owned by the business (value unknown).
>
> For example, if we assume that Rental Acosta owns 9 pieces of unencumbered real estate, and that each is worth only $50,000.00, the equity in those properties that could be tapped by selling or borrowing against the properties would total $450,000.00 — an amount far greater than the amount of Defendant's Debt to Plaintiff.
>
> Because Defendant has the burden of proof, the fact that some of the items listed above are "unknown" works against Defendant; the unknown things highlight that Defendant has not proven his future inability to pay the Debt to Plaintiff.
>
> In considering the Defendant's ability to pay the Debt to Plaintiff in the future, the Court is not limited to any particular, proven time limit. Nor is the Defendant limited to a time limit for paying the entire Debt within the 5-year maximum length that applies to Chapter 13 plans under 11 U.S.C. § 1322(d)(2). If necessary, Defendant could pay the Debt over a longer period of time, without the need for a bankruptcy case. This is especially true in this case, because Defendant really has no need for any bankruptcy relief from his other creditors. As further discussed below, Defendant filed his bankruptcy case only to try to address Plaintiff's claim against him.

> The Court concludes that Defendant failed to meet his burden of proving, by a preponderance of the evidence, that his Debt to Plaintiff is, to any extent, "unreasonable in light of the [Defendant D]ebtor's financial circumstances," within the meaning of [*In re Sorah*, 163 F.3d 397, 41 (6th Cir. 1998)], and that the Debt, to any extent, "exceeds what the [Defendant D]ebtor can reasonably be expected to pay [according to the *Sorah* analysis]."

*Id.* at 287-88. Valdivia filed this appeal, in which he challenges the bankruptcy court's determination of nondischargeability and its assessment of his ability to repay the debt.

II.

District courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. 28 U.S.C. § 158(a)(1); *Central States, Se. & Sw. Areas Pension Fund v. U.S. Truck Co. Holdings, Inc. (In re U.S. Truck Co. Holdings)*, 341 B.R. 596, 599 (E.D. Mich. 2006). The Sixth Circuit has held that "finality 'is considered in a more pragmatic and less technical way in bankruptcy cases than in other situations.'" *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 578 (6th Cir. 2008) (quoting *Lindsey v. O'Brien, Tanksi, Tanzer & Young Health Care Providers of Conn. (In re Dow Corning)*, 86 F.3d 482, 488 (6th Cir. 1996)). A final judgment in an adversary proceeding terminates a "discrete dispute[]" in the larger bankruptcy case, and therefore "it may be appealed immediately." *Ibid.*; *see also Morton v. Morton (In re Morton)*, 298 B.R. 301, 303 (B.A.P. 6th Cir. 2003) (noting that an order overruling a Chapter 13 debtor's objection to claims was a final order because it ended litigation on the merits and left nothing for the court but the execution of judgment).

This Court reviews the bankruptcy court's factual findings for clear error and gives fresh review to its conclusions of law. Fed. R. Bankr. P. 8013; *B-Line, LLC v. Wingerter (In re Wingerter)*, 594 F.3d 931, 935-36 (6th Cir. 2010) (citing *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 433 (6th Cir. 2004)). A clear-error review standard simply asks "'whether a reasonable person could agree with the bankruptcy court's decision.'" *Waldman v. Stone*, 698 F.3d 910, 922 (6th

Cir. 2012) (quoting *Volvo Comm. Fin. LLC the Americas v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 685-86 (6th Cir. BAP 2005)). This Court will "not disturb the bankruptcy court's findings of fact unless there is the 'most cogent evidence of mistake of justice.'" *WesBanco Bank of Barnesville, Ohio v. Rafoth (In re Baker & Getty Fin. Servs. Inc.)*, 106 F.3d 1255, 1259 (6th Cir. 1997) (quoting *Newton v. Johnson (In re Edward M. Johnson & Assocs., Inc.)*, 845 F.2d 1395, 1401 (6th Cir. 1988)).

Valdivia argues that the bankruptcy court erred by holding as a matter of law that the $300,000 debt established by the consent judgment was for spousal support, and by finding at trial that he could afford to pay it.

Section 523 of the Bankruptcy Code plainly states that "[a] discharge under [Chapter 13 of the Code] does not discharge an individual debtor from any debt . . . for a domestic support obligation." 11 U.S.C § 523(a)(5). A "domestic support obligation" includes those debts that are (1) owed to a former spouse; (2) are "in the nature of" alimony or support to the former spouse; (3) established by "an order of a court of record"; and (4) "not assigned to a nongovernmental entity." 11 U.S.C. § 101(14A). Congress intended "to make most divorce-related obligations nondischargeable" in bankruptcy. *In re Sorah*, 163 F.3d 397, 401 (6th Cir. 1998). However, even if the bankruptcy court finds that a debt is a domestic support obligation because it has the "indicia of support" of a child or ex-spouse, it still may be discharged if the debtor can prove "that the obligation is unreasonable in light of the debtor's financial circumstances." *Id.* at 402 (citing *In re Calhoun,* 715 F.2d 1103, 1110 (6th Cir.1983)).

A.

Valdivia first argues that the bankruptcy court's ruling that the debt was a spousal support obligation was flawed because (1) there was "no evidence" presented at trial to establish

nondischargeability, (2) the terms of the divorce decree make clear that it comprised a "division of property" and not "spousal support," and (3) the plaintiff-appellee presented no evidence at trial of her "financial circumstance[s] including her income or employment and that of her new husband, her assets (including a family trust previously valued in the millions), or anything else that she relies on for support," but, according to the appellant, "[i]t was her burden to provide evidence that payment of the debt is necessary for her maintenance and support." There are problems with these arguments, some obvious, others less so.

Valdivia's first objection to the spousal support determination is a non-sequitur. The record plainly reflects why there was "no evidence" on dischargeability presented at trial: because the question was decided as a matter of law on summary judgment. There was no error in the trial court's supposed failure to take evidence on a question that was not present for trial.

Valdivia's third argument that Hauk failed to present evidence of her "ongoing need" for support also is groundless, because, as the *Sorah* court held, a debtor categorically is prohibited from contesting payment of spousal support by attempting to dispute the need for or amount of support awarded by a state court. *In re Sorah*, 163 F.3d at 401-02. The bankruptcy court's findings are not undermined simply because it did not take or consider evidence on grounds that the debtor was prohibited as a matter of law from arguing in his defense.

For the debtor's second argument, the Sixth Circuit has prescribed the "duck test" to determine whether a debt is a "domestic support obligation." *Id.* at 401 ("There is a saying that if something looks like a duck, walks like a duck, and quacks like a duck, then it is probably a duck. In determining whether an award is actually support, the bankruptcy court should first consider whether it 'quacks' like support."). That test directs the bankruptcy court to "look to the traditional state law indicia that are consistent with a support obligation. These include, but are not

necessarily limited to, (1) a label such as alimony, support, or maintenance in the decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits." *In re Sorah*, 163 F.3d at 401. "An award that is designated as support by the state court and that has the above indicia of a support obligation (along with any others that the state support statute considers) should be conclusively presumed to be a support obligation by the bankruptcy court," and "[a] non-debtor spouse who demonstrates that these indicia are present has satisfied his or her burden of proving that the obligation constitutes support within the meaning of § 523, and is thus nondischargeable." *Ibid.*

The bankruptcy court considered and applied all of these factors. Valdivia conceded that the consent judgment was labeled a support obligation; there was no material fact question on that score. And he signed off on the provision in the state court consent decree that acknowledged the explicit legal consequence of that concession; that the debt "will not be discharged in bankruptcy." The bankruptcy court, however, did not accept that statement as conclusive or binding on it. In assessing other factors, the court found no material fact dispute that the debt was "a direct payment to a former spouse." The court's summary analysis of the debt bearing indicia of support faithfully applied *Sorah*'s analytical framework:

> In addition to the label, such indicia are (1) as described above, the other clear, implicit but strong indications in the Judgment of Divorce that the debt obligations were intended by the State Court for the support of Plaintiff; (2) the direct-payment nature of Defendant's obligations to Plaintiff, as described above; (3) the State Court's adoption of the Arbitrator's finding that Plaintiff "is and has been without sufficient funds to maintain" the Divorce Case litigation; (4) the State Court's discussion of how the line of credit used to operate the Restaurant business "was secured by the home of" Plaintiff only, and not by any property of Defendant, and that Defendant's obligations to Plaintiff under the Judgment of Divorce included Defendant's 50% liability on that credit line; and (5) the fact that under Michigan law, relief labeled as "spousal support" need not be awarded to a spouse if,

considering all the circumstances, "the estate and effects awarded to" that spouse are sufficient "for the suitable support and maintenance of" that spouse.

*In re Valdivia*, 615 B.R. at 237-39 (citing *See* Mich. Comp. Laws § 552.23(1)). Valdivia has not identified any basis to undermine that analysis or to create a fact question that suggests that the obligation was anything other than a spousal support obligation.

B.

Once that determination is made, the burden shifted to the debtor to prove that the debt "is unreasonable in light of [his] financial circumstances." *In re Sorah*, 163 F.3d 401. To prevail, he had to convince the bankruptcy court that the amount of the debt exceeds his present and future ability to pay it. *Id*. at 402; *In re Andrus*, 338 B.R. 746, 752 (Bankr. E.D. Mich. 2006) (observing that "'the nondischargeability provision of § 523(a)(5) is given a broad construction so as to promote the Congressional policy that favors enforcement of obligations for spousal and child support'") (quoting *In re Luman*, 238 B.R. 697, 704 (Bankr. N.D. Ohio 1999)).

Valdivia argues that the bankruptcy court's assessment of his ability to pay was flawed because it overlooked the following aspects of his financial affairs: (1) his filing of multiple bankruptcy petitions in the past several years, (2) his trial testimony that "until just over a year ago, he was unable to meet his ordinary expenses and needed to borrow from his father," and (3) his "limited employment opportunities," based on his age (57 years old) and high-school education, and an inability despite repeated efforts to have his state builder's license reinstated. Valdivia argues that the bankruptcy court: (1) erroneously determined that he was underemployed, based on a misconstruction of his trial testimony, (2) improperly relied on Hauk's testimony about valuation of real properties Valdivia owned that could be sold, (3) improperly afforded "more weight" to Hauk's trial testimony than his own, (4) made unsubstantiated assumptions about his future interest in his father's business, and (5) "cast a shadow" over the proceedings by citing

factual findings of a divorce arbitrator about Valdivia's "history of dishonesty and fraud" during the divorce litigation.

There was no clear error in the bankruptcy court's assessment of the evidence. First, Valdivia has not explained how his serial bankruptcy petitions have any bearing on his present ability to pay. Moreover, he has pointed to nothing in the record calling into question the bankruptcy court's conclusion that, beyond the transparent attempt to shirk his obligation to Hauk, he did not need the protections of the Bankruptcy Code, and his personal economic affairs otherwise were sound. *In re Valdivia*, 617 B.R. at 288 ("If necessary, Defendant could pay the Debt over a longer period of time, without the need for a bankruptcy case. This is especially true in this case, because Defendant really has no need for any bankruptcy relief from his other creditors."). Valdivia also has not cited any legal authority supporting his argument that the mere existence of past or present bankruptcy proceedings somehow is relevant to the assessment of a debtor's present and future capacity to pay.

Second, the bankruptcy court did not overlook evidence about Valdivia's past borrowing from his father to cover personal expenses. It did, however, reasonably discount any value of that testimony bearing on his present and future ability to pay, because Valdivia's schedule of debts revealed that the entire borrowing amounted to only around $30,000, the personal loan was not evidenced by any promissory note or other written accounting of principal or interest, and Valdivia admitted at trial that he last borrowed from his father around 15 months before the trial in this case. *In re Valdivia*, 617 B.R. at 284. That record evidence, which Valdivia does not dispute, reasonably supported the assessment that the borrowing from his father did not undermine the soundness of his present financial condition.

Third, Valdivia asserts that the bankruptcy court overlooked his "limited employment opportunities," based on his age (57 years old) and high-school education, and an inability despite repeated efforts to have his state builder's license reinstated. But the bankruptcy court found that there was undisputed testimony that Valdivia in the past had completed construction jobs for cash, and he presented no evidence that he was incapable of doing the same work presently and in the future. *In re Valdivia*, 617 B.R. at 286 ("Plaintiff's unrebutted testimony, which the Court finds credible, especially since Defendant did not dispute it, included the following. Defendant has done cement work since he was a boy. He did cement work at his Deering property in Garden City, Michigan, and at the restaurant that Plaintiff and Defendant built when they were married, which was known as Dario's Italian Eatery, doing business as D&M Valdivia Restaurants, Inc. (referred to below as the 'Restaurant'). Defendant has substantial experience doing cement construction work. When the parties were married, Defendant did construction jobs, mostly with cement, for cash. And Plaintiff is not aware of any reason why Defendant could not have continued to do such jobs over the years, and into the present."). Moreover, Valdivia himself testified that he has performed various duties as an "agent" of his father's property management business, and he has pointed to no evidence suggesting that he is incapable of finding further employment doing the same work for others.

Fourth, and relevant to the above point, Valdivia contends that he "never testified" that he only works part-time for his father's business, and that the bankruptcy court therefore erroneously concluded that he was underemployed. That position is belied by the trial record, where the plaintiff plainly answered "No" when asked if his employment with the family business was full-time. Trial Tr. at 60, ECF No. 11-1, PageID.1306 ("THE COURT: Okay. Do you work full time at Rental La Casa? VALDIVIA: No, it varies."). Valdivia has not pointed to any evidence

suggesting that he works *more than* full-time, and the reasonable inference from the only responsive testimony is that he works *less than* full-time, i.e., part-time only.

Fifth, Valdivia contends that the bankruptcy court erred by accepting Hauk's rather than his own assessment of the value of a single-family rental home that he owns in Garden City, Michigan. But the bankruptcy court found Valdivia's value assessment not credible for multiple reasons, including that (1) he asserted that the market value was equal to the taxable state assessed value of $50,000, (2) he admitted that he had paid $79,000 for the property when he bought it in 1990 (far in excess of his asserted valuation), and (3) he admitted that since he bought the home he had "made improvements to the property, including new siding on the outside and new carpeting on the inside." *In re Valdivia*, 617 B.R. at 285. In light of those admissions, there was no clear error in the bankruptcy court's assessment that Hauk's proposed valuation of $125,000 was more credible than Valdivia's, where Valdivia had not presented any other evidence calling into question Hauk's estimate, which was based on her extensive real-estate sales experience in the relevant market, and considering three decades of value appreciation and improvements to a property than had been used as a rental unit.

Sixth, Valdivia contends that the bankruptcy court improperly afforded "more weight" to Hauk's trial testimony than his own, but that is not grounds for reversal because "[d]etermination of the credibility of a witness is within the sole province of the finder of fact and is not subject to review." *Alder v. Burt*, 240 F. Supp. 2d 651, 660 (E.D. Mich. 2003) (citing *United States v. Saunders*, 886 F.2d 56 (4th Cir. 1989)). The bankruptcy court was exclusively charged with the duty of assessing witness credibility and assigning weight to the various sources of evidence it received. Nothing in the trial record suggests that it did so in any way improperly or without considering all of the testimony that was taken.

Seventh, Valdivia contends that the bankruptcy court improperly concluded that he had an "ownership interest" in his father's property management company, Rental Acosta. But it did not make any such finding. Instead, it reasonably inferred from the undisputed record that it was probable Valdivia would acquire a future interest by inheritance from his father, who is the sole owner of the business, where the only potential heirs identified by the evidence were Valdivia and his brother. As the bankruptcy court noted, Valdivia offered little evidence about the business beyond his admissions that it solely is owned by his father, who is 86 years old and in poor health, Valdivia is the principal employee of the business, and his brother has no involvement with the enterprise. The bankruptcy court found that, in the absence of evidence to the contrary, it was reasonable to assume that Valdivia could acquire some interest in the business in the future, and it made reasonable (indeed, notably conservative) assumptions about the likely value of the business assets based on limited testimony about the nine properties that it holds. The bankruptcy court's assumptions about two brothers' probable shared heritable interest in property solely owned by a parent with no other living heirs certainly were reasonable — particularly with the notable absence of evidence suggesting any contrary result. *See* Mich. Comp. Laws § 700.2103 ("Any part of the intestate estate that does not pass to the decedent's surviving spouse under section 2102, or the entire intestate estate if there is no surviving spouse, passes in the following order to the following individuals who survive the decedent . . . The decedent's descendants by representation . . . .").

Finally, Valdivia contends that the bankruptcy court "cast a shadow" over the proceedings by citing factual findings of a divorce arbitrator about Valdivia's "history of dishonesty and fraud" during the divorce litigation. But he has not explained how the mere recitation of factual findings stated in the public record, by another court in another proceeding, and which he has not impeached

in any way, suggests that the bankruptcy court erred in assessing Valdivia's present financial worthiness.

Nothing in the trial record remotely approaches the "most cogent evidence of a mistake of justice" by the court below, and there are, therefore, no grounds for this Court to disturb the bankruptcy court's findings of fact. *WesBanco*, 106 F.3d at 1259. Moreover, Valdivia has pointed to nothing in the record calling into question the bankruptcy court's primary conclusion, which was that, by offering little or no relevant evidence about most pertinent aspects of his financial affairs, he simply had failed to carry his burden of proving by a preponderance of the evidence that he was unable to pay the debt. *In re Valdivia*, 617 B.R. at 287 ("Defendant failed to prove that either now or in the future, he will be unable to pay any or all of the Debt to Plaintiff, from a combination of the following sources: his actual, disclosed income; plus additional income that Defendant has the ability to make; plus liquidation of property that Defendant has or in the future is likely to have."). Valdivia argues that the bankruptcy court's errors reveal an overindulgence of the appellee's trial case. But a converse rule of decision applies here; the *appellant* had the burden of proof on unreasonability. The record shows that the bankruptcy court reasonably found that he failed to sustain his case with sufficient credible evidence.

III.

The debtor-appellant has not shown that the bankruptcy court erred in determining as a matter of law that the $300,000 debt owing to Mary Hauk is a spousal support obligation or clearly erred in its determination of the debtor's ability to pay.

The judgment of the bankruptcy court is **AFFIRMED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: May 13, 2021